IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS UNION AND PARTICIPATING FOOD INDUSTRY EMPLOYERS TRI-STATE PENSION FUND, Individually and On Behalf of All Others Similarly Situated, | No. |
| | CLASS ACTION COMPLAINT |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| BANK OF NOVA SCOTIA, NEW YORK AGENCY; BARCLAYS CAPITAL INC.; BMO CAPITAL MARKETS CORP.; BNP PARIBAS SECURITIES CORP.; CANTOR FITZGERALD & CO.; CIBC WORLD MARKETS CORP.; CITIGROUP GLOBAL MARKETS INC.; COMMERZ MARKETS LLC; CREDIT SUISSE SECURITIES (USA) LLC; DAIWA CAPITAL MARKETS AMERICA INC.; DEUTSCHE BANK SECURITIES INC.; GOLDMAN, SACHS & CO.; HSBC SECURITIES (USA) INC.; JEFFERIES LLC; J.P. MORGAN SECURITIES LLC; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; MIZUHO SECURITIES USA INC.; MORGAN STANLEY & CO. LLC; NOMURA SECURITIES INTERNATIONAL, INC.; RBC CAPITAL MARKETS, LLC; RBS SECURITIES INC.; SG AMERICAS SECURITIES, LLC; TD SECURITIES (USA) LLC; and UBS SECURITIES LLC | |
| Defendants. | |

1.      Plaintiff United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund ("Plaintiff" or "United Food") brings this action under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15(a) and 26, and the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.* on behalf of itself and other similarly situated investors that purchased or sold marketable securities issued by the United States Department of Treasury ("U.S. Treasury") (collectively, "U.S. Treasury Securities") or futures, options, or other financial instruments based on U.S. Treasury Securities (collectively, "U.S. Treasury-Based Instruments") during the period beginning on at least January 1, 2007 and continuing through the present (the "Class Period").  As alleged herein, Plaintiff and the proposed Class were harmed by being forced to buy and sell U.S. Treasury Securities and U.S. Treasury-Based Instruments (collectively, U.S. Treasury-Based Products) at artificial prices[1] as the result of market manipulation by Defendants (defined below) who served, during the Class Period, as "Primary Dealers" (defined below) –  a handful of firms approved to buy and sell securities directly from the government with the intention of reselling them to others – in the under-regulated U.S. Treasury Securities market.

## NATURE OF THE ACTION

2.      The market for U.S. Treasury Securities is often considered the largest securities market in the world, with $12.7 trillion dollars in U.S. Treasury Securities currently outstanding. The rates set at ostensibly competitive auctions for newly-issued U.S. Treasury Securities provide an important benchmark impacting numerous other financial instruments, from consumer credit

---

[1] For ease of reference, "price" as used in this complaint may also refer to yield and/or discount rate, as appropriate depending on the type(s) of financial products being discussed.

cards to corporate debt.

3.      Despite its enormous size and high trading volume, however, it is a market dominated by Defendants—a small handful of powerful market participants that serve as Primary Dealers in the auction of newly-issued U.S. Treasury Securities, and serve as market makers in the secondary market for U.S. Treasury Securities.  "Primary Dealers" are entrusted to conduct their operations in a manner that fosters trading integrity and supports an efficient and competitive marketplace.  When "Primary Dealers" adhere to the highest ethical standards and industry best practices, it benefits the Treasury, market participants, and the public.

4.      At issue in this litigation is Defendants' manipulation of the auction process for trillions of dollars of newly-issued U.S. Treasury Securities each year, which in turn influences the prices of U.S. Treasury Securities in the secondary market, as well as the prices of U.S. Treasury-Based Instruments, such as exchange-traded U.S. Treasury futures and options.

5.      The competitive auction process for newly-issued U.S. Treasury Securities is *supposed* to work as follows:  Primary Dealers submit bids for U.S. Treasury Securities reflecting the lowest rate, yield, or discount margin at which the bidder would agree to purchase the offered U.S. Treasury Securities, with bids driven solely by supply and demand fundamentals in a competitive non-manipulated market.  However, Defendants undermined the auction process by sharing information with each other about their clients' bids and trading strategies for U.S. Treasury Securities, enabling Defendants to coordinate bids and trading strategies with their co-conspirators to the detriment of other investors, including Plaintiff and members of the Class.

6.      The information shared between and among the co-conspirators was non-public, and investors outside the Defendants' conspiracy were thus harmed by being forced to trade at an informational disadvantage, and the competitive bidding process for U.S. Treasury Securities – the

largest debt market in the world – was thus rigged in favor of the conspirators.

7.     Indeed, as active and sophisticated financial institutions, Defendants specifically intended to, and did, cause the unlawful and artificial manipulation of prices for U.S. Treasury Securities and U.S. Treasury-Based Instruments and knew that manipulation of auction prices for U.S. Treasury Securities would have a direct corresponding effect on the secondary market and the market for U.S. Treasury-Based Instruments, and would cause actual damages to Plaintiff and members of the proposed Class.

8.     By and through their unlawful conspiracy, Defendants intended to, and did, reduce their exposure to trading risk, earning billions of dollars more profits than they otherwise would have in a competitive market, at the expense of unwitting investors such as Plaintiffs and members of the proposed Class.

9.     Plaintiff's economic injuries flowed directly from Defendants' collusive and anticompetitive manipulation of the markets for Treasury-Based Products, and Defendants were fully aware of the foreseeable consequences of their collusive, manipulative, and anticompetitive conduct.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337(a), and pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25.

11.     Venue is proper in this District pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§15(a), 22, and 26, Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25(c), and 28 U.S.C. §1391(b), (c), and (d).  One or more of the Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events giving rise to Plaintiff's claims

arose in the District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

12.     Each Defendant is subject to personal jurisdiction because each transacted business throughout the United States, including in this District, including by transacting in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiff and members of the Class throughout the United States and in this District.

13.     Defendants' activities, and those of their co-conspirators, were within the flow of, and were intended to, and did in fact, have a substantial effect on, foreign and interstate commerce. During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, in furtherance of their illegal conspiracy.

14.     Defendants' collusive, manipulative, and anticompetitive conduct alleged herein had direct, substantial, and reasonably foreseeable effects on U.S. domestic commerce, and such effects give rise to Plaintiff's claims.

## THE PARTIES

### I.     PLAINTIFF

15.     Plaintiff transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments during the Class Period directly with Defendants at manipulated prices that were caused by Defendants' collusive, manipulative, and anticompetitive conduct, resulting in injury to its business or property by reason of Defendants' unlawful conduct.

### II.     DEFENDANTS

16.     Defendant Bank of Nova Scotia, New York Agency is an uninsured state agency of The Bank of Nova Scotia, and maintains its principal offices in New York, New York.  As used herein, "Bank of Nova Scotia" includes Defendant Bank of Nova Scotia, New York Agency and

its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, Bank of Nova Scotia served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiff and/or members of the Class.

17.    Defendant Barclays Capital Inc. is a Connecticut corporation with its principal offices in New York, New York.   As used herein, "Barclays" includes Barclays Capital Inc.  and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, Barclays served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiff and/or members of the Class.

18.    Defendant BMO Capital Markets Corp. is a Delaware corporation with its principal offices in New York, New York.  As used herein, "BMO" includes BMO Capital Markets Corp. and its parent companies, subsidiaries, affiliates, predecessors, and successors.   During the Class Period, BMO served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiff and/or members of the Class.

19.    Defendant BNP Paribas Securities Corp. is a Delaware corporation with its principal offices in New York, New York.  As used herein, "BNP" includes BNP Paribas Securities Corp. and its parent companies, subsidiaries, affiliates, predecessors, and successors.   During the Class Period, BNP served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiff and/or members of the Class.

20.    Defendant Cantor Fitzgerald & Co. is a general partnership organized under the laws

of the State of New York, and maintains its principal offices in New York, New York.  As used herein, "Cantor" includes Cantor Fitzgerald & Co. and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, Cantor served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiff and/or members of the Class.

21.    Defendant CIBC World Markets Corp. is a Delaware corporation with its principal offices in New York, New York.  As used herein, "CIBC" includes CIBC World Markets Corp. and its parent companies, subsidiaries, affiliates, predecessors, and successors.   During the Class Period, CIBC served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiff and/or members of the Class.

22.    Defendant Citigroup Global Markets Inc. is a New York corporation with its principal offices in New York, New York.  As used herein, "Citigroup" includes Citigroup Global Markets Inc. and its parent companies, subsidiaries, affiliates, predecessors, and successors, including Citibank N.A.  During the Class Period, Citigroup served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiff and/or members of the Class.

23.    Defendant Commerz Markets LLC, formerly known as Dresdner Kleinwort Securities LLC, is a Delaware corporation with its principal offices in New York, New York.  As used herein, "Commerz" includes Commerz Markets LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, Commerz, under its former name, served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiff and/or members of the Class.

24.     Defendant Credit Suisse Securities (USA) LLC is a Delaware company with its principal offices in New York, New York.  As used herein, "Credit Suisse" includes Credit Suisse Securities (USA) LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, Credit Suisse served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiff and/or members of the Class.

25.     Defendant Daiwa Capital Markets America Inc. is a New York corporation with its principal offices in New York, New York.   As used herein, "Daiwa" includes Daiwa Capital Markets America Inc. and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, Daiwa served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiff and/or members of the Class.

26.     Defendant Deutsche Bank Securities Inc. is a Delaware corporation with its principal offices in New York, New York.  As used herein, "Deutsche Bank" includes Deutsche Bank Securities Inc. and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, Deutsche Bank served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiff and/or members of the Class.

27.     Defendant Goldman, Sachs & Co. is a New York corporation with its principal offices in New York, New York.  As used herein, "Goldman Sachs" includes Goldman, Sachs & Co. and its parent companies, subsidiaries, affiliates, predecessors, and successors.    During the Class Period, Goldman Sachs served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiff and/or members

of the Class.

28.     Defendant HSBC Securities (USA) Inc. is a Delaware corporation with its principal offices in New York, New York.  As used herein, "HSBC" refers to HSBC Securities (USA) Inc. and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, HSBC served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiff and/or members of the Class.

29.     Defendant Jefferies LLC is a Delaware company with its principal offices in New York, New York.  As used herein, "Jefferies" refers to Jefferies LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, Jefferies served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiff and/or members of the Class.

30.     Defendant J.P. Morgan Securities LLC is a Delaware company with its principal offices in New York, New York.  As used herein, "JPMorgan" includes J.P. Morgan Securities LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, JPMorgan served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiff and/or members of the Class.

31.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated is a Delaware corporation with its principal offices in New York, New York.  As used herein, "Merrill Lynch" includes Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, Merrill Lynch served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S.

Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiff and/or members of the Class.

32.    Defendant Mizuho Securities USA Inc. is a Delaware corporation with its principal offices in New York, New York.   As used herein, "Mizuho" includes Mizuho Securities USA Inc. and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, Mizuho served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiff and/or members of the Class.

33.    Defendant Morgan Stanley & Co. LLC is a Delaware company with its principal offices in New York, New York.  As used herein, "Morgan Stanley" includes Morgan Stanley & Co. LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors.   During the Class Period, Morgan Stanley served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiff and/or members of the Class.

34.    Defendant Nomura Securities International, Inc. is a New York corporation with its principal offices in New York, New York.  As used herein, "Nomura" includes Nomura Securities International, Inc. and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, Nomura served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiff and/or members of the Class.

35.    Defendant RBC Capital Markets, LLC is a Minnesota company with offices in New York, New York.  As used herein, "RBC" includes RBC Capital Markets, LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, RBC

served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiff and/or members of the Class.

36.     Defendant RBS Securities Inc. is a Delaware corporation with its principal offices in Stamford, Connecticut.  As used herein, "RBS" includes RBS Securities Inc. and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, RBS served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiff and/or members of the Class.

37.     Defendant SG Americas Securities, LLC is a Delaware company with its principal offices in New York, New York.  As used herein, "SG Americas" includes SG Americas Securities, LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, SG Americas served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiff and/or members of the Class.

38.     Defendant TD Securities (USA) LLC is a Delaware company with its principal offices in New York, New York.  As used herein, "TD Securities" includes TD Securities (USA) LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, TD Securities served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiff and/or members of the Class.

39.     Defendant UBS Securities LLC is a Delaware company with its principal offices in New York, New York.  As used herein, "UBS" includes UBS Securities LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, UBS served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities

and/or U.S. Treasury-Based Instruments with Plaintiff and/or members of the Class.

40.     Bank of Nova Scotia, New York Agency, Barclays Capital Inc., BMO Capital Markets Corp., BNP Paribas Securities Corp., Cantor Fitzgerald & Co., CIBC World Markets Corp., Citigroup Global Markets Inc., Commerz Markets LLC, Credit Suisse Securities (USA) LLC, Daiwa Capital Markets America Inc., Deutsche Bank Securities Inc., Goldman, Sachs & Co., HSBC Securities (USA) Inc., Jefferies LLC, J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Mizuho Securities USA Inc., Morgan Stanley & Co. LLC, Nomura Securities International, Inc., RBC Capital Markets, LLC, RBS Securities Inc., SG Americas Securities, LLC, TD Securities (USA) LLC, and UBS Securities LLC are collectively referred to herein as "Defendants" or "Primary Dealers."

41.     Whenever reference is made in this Complaint to any act, deed, or transaction of any Defendant, the allegation means that the Defendant engaged in the act, deed, or transaction by or through its officers, directors, agents, affiliates, employees, or representatives while such individuals or entities were actively engaged in the management, direction, control, or transaction of the Defendant's business or affairs.

### III.   UNNAMED CO-CONSPIRATORS

42.     Various other non-parties also participated as co-conspirators, performed acts, and made statements in furtherance of the conspiracy.  Plaintiff reserves the right to identify other co-conspirators and to subsequently name some or all such co-conspirators, whether identified here or not, as Defendants.

### IV.   JOINT AND SEVERAL LIABILITY

43.     Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint.  Each Defendant acted as the agent

or co-conspirator of the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## FACTUAL ALLEGATIONS

I.      BACKGROUND ALLEGATIONS

    A.      U.S. Treasury Securities

44.     The United States issues and repurchases U.S. Treasury Securities to control the amount of base money in the U.S. economy.  The U.S. Federal Reserve Bank relies heavily on these so called "open market operations" as a means to implement the U.S. government's monetary policy with respect to things such as interest rates, exchange rates, inflation, or target unemployment rates.

45.     There are five primary types of marketable U.S. Treasury Securities:  Treasury Bills; Treasury Notes; Treasury Bonds; Treasury Inflation-Protected Securities ("TIPS"); and Floating Rate Notes ("FRNs").

46.     Treasury Bills are sold in increments of $100 and are generally issued in four-, 13-, 26-, and 52-week term-lengths. Treasury Bills pay interest at maturity in the form of the difference between the initial sales price (the discount rate) and the Treasury Bill's face value.

47.     Treasury Notes are sold in increments of $100 and are issued in two-, three-, five-, seven-, or 10-year term-lengths.  Treasury Notes pay interest every six months until maturity.

48.     Treasury Bonds are sold in increments of $100 and are issued in a 30-year term-length. Treasury Bonds pay interest every six months until maturity.

49.     TIPSs are sold in increments of $100 and are issued in five-, 10-, or 30-year term-lengths.  The principal for TIPSs is adjusted to correspond to changes in inflation rates.

50.     FRNs are sold in increments of $100 and are issued in a two-year term-length.  FRNs

have variable interest rates based on current discount rates for 13-week Treasury Bills.

**B.     U.S. Treasury Securities Auctions and Bidding**

51.     U.S. Treasury Securities are sold to individual and institutional investors through public auctions conducted by the U.S. Treasury according to a set schedule.  The U.S. Treasury issued approximately $7.0 trillion in securities at 270 public auctions completed in 2014, pursuant to its auction process described in more detail below.

52.     Several days before each auction, the U.S. Treasury publishes a "Treasury Offering Announcement" describing the type, term, and amount of the securities being issued, and the date of the upcoming auction.

53.     Following such an announcement, investors may bid on the offered U.S. Treasury Security via either non-competitive or competitive bidding.

54.     A non-competitive bid indicates that an investor will buy a specified amount of the auctioned security at whatever final price is set by the competitive bidding process.  Non-competitive bids are always accepted, but each investor is limited to $5 million of non-competitive bids per auction.  Non-competitive bids may be submitted through a Primary Dealer or directly through the U.S. Treasury's TreasuryDirect system.

55.     A competitive bid indicates the lowest discount rate, yield, or discount margin an investor is willing to offer for a specified amount of the auctioned security.  Each investor is limited to the purchase through competitive bids of no more than 35% of the total amount of the offered U.S. Treasury Security.  Unlike non-competitive bids, competitive bids are not guaranteed to be accepted.  Instead, after the close of the bidding window, the U.S. Treasury accepts all non-competitive bids, and then calculates the competitive price by allocating the remaining offered securities towards competitive bids in order from most to least competitive (the government accepts

the best rates, *i.e.*, lowest yields, the open market has to offer) until all of the offered security has been accounted for with accepted bids. The last bid accepted then sets the competitive rate for all other accepted bids (*i.e.*, all accepted competitive and non-competitive bidders pay a single rate set by the competitive bidding process). Bids for less competitive rates are not accepted. Hence, the Treasury's modified Dutch auction competitive bidding process sets a rate that permits the government to get the most money for its securities while still being able to sell the entire offering.

56.    The vast majority of all competitive bids are submitted through a Primary Dealer, and thus bids submitted by Defendants, as Primary Dealers, have a significant influence over the results of auctions for U.S. Treasury Securities.

### C.    The "When-Issued" Security Market

57.    After a U.S. Treasury Securities auction is announced but before it takes place, investors begin trading the yet-to-be-issued security in what is called the "when-issued" market. These trades are agreements to exchange securities and funds at a set price on the day the new security is issued, and allow new securities issues to be efficiently distributed to investors.

58.    Primary Dealers trading in the when-issued market, however, gain access to non-public information about their clients' orders that colluding Primary Dealers can use to coordinate their positions as sellers to artificially inflate the price of treasuries in the when-issued market, and deflate the competitive auction price. Defendants have used this collusive informational advantage to artificially increase the "spread" between a) the "when-issued" prices at which they contract to sell the newly-issued securities, and b) the auction price at which they actually buy them, thus reducing or eliminating their trading risk and increasing their profits at the expense of their counterparties and other investors in U.S. Treasury Securities and U.S. Treasury-Based Instruments, the Treasury, and the public.

### D.    The Secondary Market for U.S. Treasury Securities

15

59.     After being issued and sold on the primary market, U.S. Treasury Securities are commonly traded on what is called the secondary market, in which Primary Dealers act as market makers with standing bid and offer quotes for trades in an "over the counter" market – a market in which buyers and sellers trade with each other directly, rather than through a centralized exchange market. Prices in the secondary market for U.S. Treasury Securities are heavily influenced by the prices of new issues in the primary market, and bear an inverse relationship to interest rates.

### E.     U.S. Treasury-Based Instruments

60.     U.S. Treasury Securities also provide key inputs for valuation of U.S. Treasury-Based Instruments, including futures and options, which are traded extensively by investors seeking to hedge exposure to, or profit from, the risk of interest rate changes.

61.     U.S. Treasury futures and options are available in several different contract durations ranging from two to 30 years, and are traded extensively on the Chicago Board of Trade ("CBOT"), with millions of contracts open representing billions of dollars in value at any given time.

### F.     Multiple Government Investigations Reveal Defendants' Proclivity to Collusively Manipulate Financial Markets and Benchmarks

62.     As of June 2015, the U.S. Justice Department had reportedly initiated an investigation into collusive conduct by Primary Dealers trading U.S. Treasury-Based Products, but this is not the first time these same entities have come under scrutiny for allegedly using insider information and communication in unlawful efforts to increase profits.  Indeed, there have been numerous investigations and high-profile global enforcement actions in recent years (many of which resulted in substantial guilty pleas and settlements) arising from allegations that banks – including certain Defendants –  conspired to manipulate the foreign exchange market and several international financial benchmarks, revealing Defendants' proclivity for collusive conduct.

63.     For instance, an investigation coordinated between the U.S. Justice Department and similar agencies abroad revealed that as early as 2005, banks had been colluding to manipulate the LIBOR (*i.e.*, the London Interbank Offered Rate, used by major lenders around the world to set their own interest rates) in efforts to increase their own profits. The LIBOR investigation resulted in guilty pleas, and fines in the billions of dollars, including on behalf of certain Defendants and/or their parent companies.

64.     Suspicious that such widespread collusive tendencies might not be limited to just the LIBOR rate, regulators included clauses in their settlements requiring defendants to cooperate with future investigations.

65.     Subsequent U.S. and foreign investigations into the foreign exchange (or "FX") markets revealed similar collusion to manipulate financial markets including, for instance, market participants using secret chat rooms and code language to coordinate trades, resulting yet again in guilty pleas and billions of dollars in fines paid by Defendants named in this Complaint and/or their parent companies, including Defendants J.P. Morgan Securities LLC, Citigroup Global Markets Inc., Barclays Capital Inc., and RBS Securities Inc.

66.     These large international financial institutions – whose collusive FX currency traders secretly call themselves "the Cartel" – paid fines and penalties to the U.S. Justice Department, the U.S. Commodity Futures Trading Commission ("CFTC"), the Federal Reserve, and the United Kingdom's Financial Conduct Authority, totaling approximately $9 billion, and have terminated involvement with the wrongdoing.

67.     Despite these seemingly-significant fines and penalties, regulators' subsequent investigations revealed continued collusion by financial institutions to manipulate the ISDAfix (pricing benchmark for fixed rate portion of interest rate swaps), including various communications

between banks' various trading desks, and with third party brokers, requesting artificial pressure be exerted on the ISDAfix at specific times to benefit one trading party at the expense of its counterparty.  The methods of collusion and means of manipulation employed were varied and creative, but all reveal a culture within the banking industry that puts traders' self-interests above the integrity of the financial markets.

## II.  DEFENDANTS CONSPIRED IN CONNECTION WITH THE U.S. TREASURY SECURITIES AUCTION PROCESS

68.     As noted above, by June 2015 the U.S. Justice Department had reportedly begun investigating certain financial institutions and their roles in manipulation of the U.S. Treasury Securities market, including through the manipulation of the U.S. Treasury auctions that set the prices for U.S. Treasury Securities.

69.     On information and belief, beginning at least as early as January 1, 2007, Defendants, as Primary Dealers, conspired to manipulate the market for U.S. Treasury Securities and U.S. Treasury-Based Instruments by sharing with each other valuable and competitively sensitive client bidding information regarding demand, sizes of client bids, and requested yields and discount rates in order to coordinate U.S. Treasuries auction activities to favor Defendants' own profits, to the detriment of other investors in the market.  Defendants used this confidential information to execute concerted bidding and/or trading strategies that were designed to, and did, manipulate the auction of U.S. Treasury Securities, the corresponding secondary market, and the market for U.S. Treasury-Based Instruments such as futures and options.

70.     After announcement of a U.S. Treasury Security auction but before the close of bidding, Defendants, in their role as Primary Dealers, are channeled billions of dollars in bids for U.S. Treasury Securities by their clients. This confidential information, initially received by Defendants' salespeople, was, on information and belief, forwarded to Defendants' own traders, as

well as to their purported competitors in the Primary Dealers market, to gain an informational advantage over other market participants.  This collusive sharing of non-public information presented the opportunity for Defendants to manipulate the rates and/or improve their trading positions to boost profits in the when-issued market, the secondary market for U.S. Treasury Securities, and the market for U.S. Treasury-Based Instruments.  And that is precisely what they did.

71.     Defendants' collusive actions allowed them to minimize and/or eliminate their trading risk in U.S. Treasury Securities and U.S. Treasury-Based Instruments and to reap supracompetitive profits, at the expense of Plaintiff and members of the Class.

72.     There is no reason for Defendants—as horizontal competitors in the markets for U.S. Treasury Securities and U.S. Treasury-Based Instruments—to share competitively sensitive information, such as client auction bidding order flow, with each other during the bidding window of U.S. Treasury Securities auctions absent the intent to engage in collusive, manipulative, and anticompetitive conduct.

73.     Without manipulation and collusion, Defendants faced greater risk that the markets would move against them when they executed trades.  By creating a dysfunction in pricing through a manipulated auction process, Defendants created an artificial bid/ask spread and realized risk-free or risk-reduced returns for members of their conspiracy.  By trading on non-public information, Defendants' well-informed traders gained a considerable advantage over uninformed traders. Defendants benefitted by their collusion to rig the markets for U.S. Treasury-Based Products through reduced risk, decreased losses, and increased profits, at the expense of Plaintiff and members of the Class.  As a direct and proximate result of Defendants' collusive conduct challenged herein, Plaintiff and the Class were overcharged for their purchases of U.S. Treasury-

Based Products, and were underpaid for their sale of them.

74.     The markets for U.S. Treasury-Based Products were distorted by Defendants' collusive, manipulative, and anticompetitive efforts such that Plaintiff and members of the Class were harmed.

III.    **DEFENDANTS ARE AND WERE HORIZONTAL COMPETITORS IN THE U.S. TREASURY SECURITIES AND U.S. TREASURY-BASED INSTRUMENTS MARKETS**

74.     Defendants are, and were during the Class Period, horizontal competitors in both the U.S. Treasury Securities market and the market for U.S. Treasury-Based Instruments as Primary Dealers, market makers, and direct market participants.  In the U.S. Treasury Securities market, Defendants compete with each other in three ways: (1) as Primary Dealers bidding on behalf of their clients and on their own behalf in the auction of U.S. Treasury Securities; (2) as market makers in the secondary market for U.S. Treasury Securities, offering clients access to the market at competitive terms, including bid/ask spreads; and (3) as traders for their own accounts by seeking profits from investment positions in U.S. Treasury Securities and U.S. Treasury-Based Instruments. For example, in the market for U.S. Treasury-Based Instruments, Defendants compete against each other as direct market participants by seeking profits by using futures and options to take net-long and net-short positions in the U.S. Treasury Securities market.

75.     Absent collusion, Defendants would seek to achieve the best price and terms in U.S. Treasury Securities auctions and their trading positions, and corresponding profits or losses would be determined through competition with other traders, including other Defendants. Competition among Defendants would contribute to efficiency in U.S. Treasury Securities auctions, the corresponding secondary market, and the market for U.S. Treasury-Based Products. Defendants' collusion and coordinated market activities had adverse consequences on competition and created artificial and manipulated markets.

76.     During the Class Period, Defendants transacted in U.S. Treasury-Based Products, including exchange-traded U.S. Treasury futures and options. Through their collusive conduct, Defendants manipulated the U.S. Treasury Securities auction process and/or artificially manipulated prices in the secondary market to benefit their own and/or their co-conspirators' trading positions in U.S. Treasury-Based Products.

77.     As alleged herein, Defendants' conduct injured competition in U.S. Treasury Securities auctions, the corresponding secondary market, and the market for U.S. Treasury-Based Instruments.  This collusive manipulation of the markets had an immediate, direct, substantially certain, and foreseeable impact on the prices of U.S. Treasury Securities auctions, the corresponding secondary market, and the market for U.S. Treasury-Based Instruments.

## IV.     PLAINTIFF AND MEMBERS OF THE CLASS WERE INJURED AS A RESULT OF DEFENDANTS' CONDUCT

78.     Defendants, as Primary Dealers participating in U.S. Treasury Securities auctions, were in a unique position to manipulate the pricing of the auctions and the corresponding secondary market for U.S. Treasury Securities and the market for U.S. Treasury-Based Instruments.

79.     Defendants' manipulation of the U.S. Treasury Securities auctions caused a dysfunction in the normal, when-issued market and competitive auction process, and impacted the secondary market for U.S. Treasury Securities and the market for U.S. Treasury-Based Instruments. Through their collusion in the auction process, Defendants artificially affected the purchase prices and yields in the U.S. Treasury Securities when-issued market, auction, and secondary market, and the prices of U.S. Treasury-Based Instruments, to the detriment of Plaintiffs and members of the Class.

80.     Defendants were each in a position to benefit from the manipulation of the U.S. Treasury Securities when-issued market and auctions, corresponding secondary market, and the

market for U.S. Treasury-Based Instruments in numerous ways, including, but not limited to: (1) moving the price for U.S. Treasury Securities set by the Treasury auctions in a direction that would benefit Defendants and their co-conspirators; (2) maintaining an anticompetitive "spread" or difference between the bid and ask prices at which they offered to buy and sell U.S. Treasury Securities in the when-issued, auction, and secondary markets; and/or (3) "front-running" these markets (*i.e.*, trading ahead of other investors based on non-public information that will influence the price of the underlying security) in order to benefit their trading positions, and the trading positions of their co-conspirators, to the detriment of market participants including Plaintiff and members of the Class.

81.    Defendants specifically intended to, and did, cause unlawful and artificial manipulation of prices for U.S. Treasury-Based Products and understood and knew to a substantial certainty, as active and sophisticated Primary Dealers, that manipulation of auction prices for U.S. Treasury Securities would have a direct corresponding effect on the secondary market and the market for U.S. Treasury-Based Instruments, and would cause actual damages to Plaintiffs and members of the Class.   Defendants benefitted from sharing confidential client auction bidding order flow and coordinating market activities.

82.    Defendants' manipulation of the U.S. Treasury-Based Products markets caused injury to Plaintiff and members of the Class who transacted in the manipulated markets, in securities trading at artificial prices, and/or in markets with artificial price trends during the Class Period.

83.    Plaintiff and members of the Class were harmed each time they traded in the U.S. Treasury-Based Products markets.   Plaintiff's and Class members' injuries flow directly from Defendants' collusive manipulation of the U.S. Treasury-Based Products markets and their

anticompetitive conduct.

84.    The consequences of Defendants' conduct were foreseeable and Defendants knowingly, intentionally, and/or recklessly caused such harm and injury to Plaintiffs and members of the Class.

85.    Defendants' collusion to manipulate the U.S. Treasury market directly caused Plaintiff's and Class members' actual damages in the form of diminished profits or increased losses on their transactions in U.S. Treasury Securities and U.S. Treasury-Based Instruments.

86.    The injuries to Plaintiff and members of the Class flow directly from Defendants' collusive manipulation of prices for U.S. Treasury-Based Products, which replaced prices set through competition among horizontal competitors. The injuries suffered by Plaintiff and members of the Class are of the type antitrust laws were designed to prevent.

## EQUITABLE TOLLING OF THE STATUTES OF LIMITATIONS

87.    Defendants actively and effectively concealed their collusion, as alleged herein, from Plaintiff and members of the Class.  As a result of Defendants' concealment, all applicable statutes of limitations affecting Plaintiff's and the Class members' claims have been tolled.

88.    Defendants' conspiracy was, by its very nature, secretive and self-concealing. Defendants engaged in a form of market manipulation which could not be detected by Plaintiffs or members of the Class.  The secret nature of Defendants' conspiracy, which relied on non- public methods of communication to collude with each other and other co-conspirators to manipulate the auction of U.S. Treasury Securities and the trading of U.S. Treasury Securities and U.S. Treasury-Based Instruments, prevented Plaintiff and members of the Class from uncovering Defendants' unlawful conduct.

89.    Upon information and belief, Defendants also actively conspired to conceal their

unlawful conduct.   Throughout the Class Period, Defendants, both individually and in concert, actively participated in the concealment of the scheme by misrepresenting their practices as Primary Dealers of U.S. Treasury Securities.

## CLASS ACTION ALLEGATIONS

90.   Plaintiff brings this action on behalf of itself and as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking monetary damages on behalf of the following class (the "Class"):

> All persons or entities who, between January 1, 2007 and the present (the "Class Period"), purchased or sold bonds, notes, or other marketable securities issued by the U.S. Department of Treasury, and all persons or entities who purchased or sold futures, options, or other derivatives based on such bonds, notes, or other marketable securities issued by the U.S. Treasury Department during the Class Period.
>
> Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint.

91.   Plaintiff believes that there are at least tens of thousands of members of the Class described above, making the Class so numerous and geographically dispersed that joinder of all members of the Class is impracticable.

92.   There are questions of law and fact common to each member of the Class that relate to the existence of the conspiracy alleged and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

> a.   whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, stabilize, and/or otherwise manipulate the prices of U.S. Treasury-Based Products in violation of the Sherman Antitrust Act;
>
> b.   the identity of the participants in the conspiracy;
>
> c.   the duration of the conspiracy;

      d.     the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

      e.     whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to Plaintiff and members of the Class;

      f.     whether Defendants and their co-conspirators concealed the conspiracy's existence from Plaintiff and members of the Class;

      g.     whether Defendants specifically intended to, and did in fact, manipulate prices of exchange-traded U.S. Treasury-Based Instruments, including U.S. Treasury futures and options traded on the CBOT;

      h.     whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole;

      i.     the appropriate injunctive and equitable relief for the Class; and

      j.     the appropriate measure of damages sustained by Plaintiff and members of the Class.

93.     During the Class Period, Plaintiff purchased U.S. Treasury Securities and its interests are aligned with, and not antagonistic to, the interests of the other members of the Class. Plaintiff is a member of the Class, has claims that are typical of the claims of the other members of the Class, and will fairly and adequately protect the interests of the other members of the Class. In addition, Plaintiff is represented by counsel competent and experienced in the prosecution of antitrust and other complex class action litigation.

94.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

95.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

96.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender. Moreover, prosecution of this litigation as a class action will eliminate the possibility of repetitious litigation.  Class treatment will also permit the adjudication of relatively small claims by many members of the Class who otherwise could not afford to litigate antitrust claims such as the ones asserted in this Complaint.   This litigation presents no difficulties of management that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

## FIRST  CLAIM  FOR VIOLATION OF § 1 OF THE SHERMAN  ACT

97.    Plaintiff hereby restates and incorporates the preceding paragraphs as if fully set forth herein.

98.    Defendants and their co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

99.    During the Class Period, Defendants were competitors in the market for U.S. Treasury Securities and U.S. Treasury-Based Instruments.  Nevertheless, Defendants shared with each other competitively sensitive data, such as client auction bidding order flow and Defendants' respective desires for the direction of price movements in auctions of U.S. Treasury Securities and the markets for U.S. Treasury Securities and U.S. Treasury-Based Instruments, and worked in concert to move prices in the direction they desired, to the detriment of Plaintiff and members of the Class.

100.   Prices of U.S. Treasury-Based Products were distorted by Defendants' attempts to

manipulate the auction process for U.S. Treasury Securities. As such, Plaintiff and members of the Class were deprived of the benefit of a fully competitive market for U.S. Treasury Securities and U.S. Treasury-Based Instruments.  For instance, members of the Class who purchased or sold U.S. Treasury Securities on the secondary market did so at unfavorable prices as the result of Defendants' collusive, manipulative, anticompetitive, and unlawful conduct.

101.   Similarly, members of the Class who purchased or sold U.S. Treasury-Based Instruments were also harmed by Defendants' collusion, as the prices of those instruments were tied to the prices of U.S. Treasury Securities, which, due to Defendants' collusive, manipulative, anticompetitive, and unlawful conduct, did not reflect actual market rates.

102.   Moreover, Defendants' collusive, manipulative, anticompetitive, and unlawful sharing of competitively sensitive data, such as client auction bidding order flow and Defendants' respective desires for the direction of price movements in auctions of U.S. Treasury Securities and the markets for U.S. Treasury-Based Products, allowed Defendants to trade ahead of Plaintiff and members of the Class who purchased and sold U.S. Treasury Securities in the secondary market and/or U.S. Treasury-Based Instruments.

103.   Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Act.  The conspiracy involved joint coordination among horizontal competitors to affect the prices of U.S. Treasury Securities auctioned by the U.S. Treasury.  Moreover, the conspiracy resulted in substantial anticompetitive effects in the secondary market for U.S. Treasury Securities and the market for U.S. Treasury-Based Instruments.  There is no legitimate business justification for, nor are there any procompetitive benefits caused by, Defendants' conspiracy and the acts taken in furtherance thereof.  Any ostensible procompetitive benefits of the conspiracy are pretextual, and could have been achieved by less restrictive means.

104.   As a direct, material, and proximate result of Defendants' violation of Section 1 of the Sherman Antitrust Act, Plaintiff and members of the Class have suffered injury to their business or property, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15(a), throughout the Class Period.

105.   Plaintiff and members of the Class are entitled to treble damages for Defendants' violations of Section 1 of the Sherman Antitrust Act, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

106.   Plaintiff and members of the Class are also entitled to an injunction against Defendants preventing and restraining further violations, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

## SECOND CLAIM FOR MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT

107.   Plaintiff hereby restates and incorporates the preceding paragraphs as if fully set forth herein.

108.   Defendants, through their manipulative acts alleged herein, specifically intended to, and did in fact, manipulate prices of exchange-traded U.S. Treasury-Based Instruments, including U.S. Treasury futures and options traded on the CBOT, in violation of Sections 6(c) and 9(a) of the Commodity Exchange Act, 7 U.S.C. §§ 9 and 13(a), and 17 C.F.R. §§ 180.1 and 180.2 promulgated thereunder

109.   Defendants intended that their wrongful acts would result in prices of exchange-traded U.S. Treasury-Based Instruments being artificially priced during the Class Period.

110.   Defendants, due to their roles as Primary Dealers of U.S. Treasury Securities and a result of their significant market power, including their role as market makers, had the ability to influence prices of U.S. Treasury-Based Instruments, including U.S. Treasury futures and options

traded on the CBOT.

111.   As a result of Defendants' conduct described herein, Defendants caused the prices of exchange-traded U.S. Treasury-Based Instruments to be artificially priced during the Class Period.

112.   Members of the Class who transacted in U.S. Treasury-Based Instruments during the Class Period did so at artificial prices resulting from Defendants' manipulation in violation of the Commodity Exchange Act.

113.   Defendants' conduct violated Sections 6(c) and 9(a) of the Commodity Exchange Act, 7 U.S.C. §§ 9 and 13(a), and 17 C.F.R. §§ 180.1 and 180.2 promulgated thereunder.  As such, Defendants are liable for damages pursuant to Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25.

## THIRD  CLAIM  FOR  PRINCIPAL-AGENT LIABILITY IN VIOLATION OF THE COMMODITY EXCHANGE ACT

114.   Plaintiff hereby restates and incorporates the preceding paragraphs as if fully set forth herein.

115.   Each Defendant is liable under Section 2(a)(1)(B) of the Commodity Exchange Act, 7 U.S.C. § 2(a)(1)(B), for the conduct of their agents, representatives, and other persons acting for them in the scope of their employment or office, carried out in violation of the Commodity Exchange Act.

116.   As a result of Defendants' liability for the unlawful conduct of their agents, representatives, and other persons acting for them in the scope of their employment or office, Defendants are liable for damages pursuant to Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25.

## FOURTH CLAIM FOR AIDING AND ABETTING MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT

117.   Plaintiff hereby restates and incorporates the preceding paragraphs as if fully set forth herein.

118.   Each Defendant is liable under Section 13 of the Commodity Exchange Act, 7 U.S.C. § 13c, as a principal violator of the Commodity Exchange Act due to each Defendants' willful aiding, abetting, counseling, commanding, and/or inducing the violations of the Commodity Exchange Act described herein.

119.   Each Defendant is further liable under Section 13 of the Commodity Exchange Act, 7 U.S.C. § 13c, as a principal violator of the Commodity Exchange Act due to each Defendant's actions in combination or concert with other Defendants in order to effect the violations of the Commodity Exchange Act described herein.

120.   As a result of Defendants' liability for their aiding and abetting of the violations described herein, and for the unlawful conduct of their co-conspirators, Defendants are liable for damages pursuant to Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25.

### PRAYER FOR RELIEF

121.   Plaintiff demands relief as follows:

a.      that the Court certify this lawsuit as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be designated as Class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

b.      that the unlawful conduct alleged herein be adjudged and decreed to violate Section 1 of the Sherman Antitrust Act and the Commodity Exchange Act;

c.      that Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged herein;

d.      that the Court award Plaintiff and the Class damages against

Defendants for their violations of federal antitrust laws, in an amount to be trebled under Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15 (a), and for their violations of the Commodity Exchange Act, plus interest;

e.    that the Court award Plaintiff its costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law; and

f.    that the Court direct any such further relief that it may deem just and proper.

## DEMAND FOR JURY TRIAL

122. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: July 28, 2015

RADICE LAW FIRM, P.C.

JOHN RADICE
KENNETH PICKLE
34 Sunset Blvd.
Long Beach, NJ 08008
Tel:    646-386-7688
Fax:    609-385-0745
jradice@radicelawfirm.com
kpickle@radicelawfirm.com

SHEPHERD, FINKELMAN,
MILLER & SHAH, LLP
ERIC. L. YOUNG
NATALIE FINKELMAN BENNETT
35 East State Street
Media, PA 19063
Tel: 610-891-9880
Fax: 866-300-7367

31

eyoung@sfmslaw.com
nfinkelman@sfmslaw.com

**SHEPHERD, FINKELMAN,
MILLER & SHAH, LLP**
JAMES E. MILLER
65 Main Street
Chester, CT 06412
Tel: 860-526-1100
Fax: 866-300-7367
jmiller@sfmslaw.com

**BERGER & MONTAGUE, P.C.**
MERRILL G. DAVIDOFF
ERIC L. CRAMER
DAVID F. SORENSEN
1622 Locust Street
Philadelphia, PA 19103
Tel: 800-424-6690
Fax: 215-875-4604
mdavidoff@bm.net
ecramer@bm.net
dsorensen@bm.net